IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

THE BOOKSTORE, INC., an                    09-CV-1490-BR
Oregon corporation; DANIEL
COSSETTE; DONNA COSSETTE;                  OPINION AND ORDER
MICHAEL WRIGHT; and LINDA
WRIGHT,

       Plaintiffs,

v.

RANDY LEONARD, individually
and in his capacity as
Portland City Commissioner;
MICHAEL ALDERMAN,
individually and in his
capacity as a Portland City
Fire Inspector; JEFF MYERS,
individually and in his
capacity as a Portland Police
Bureau Officer; JOSEPH
BOTKIN, individually and in
his capacity as a Portland
Bureau of Development
Services Inspector; HANK
McDONALD, individually and in
his official capacity as a
Portland Bureau of
Development Services
Inspector; CITY OF PORTLAND,
a municipal corporation; and
PORTLAND GENERAL ELECTRIC,

       Defendants.

**RANDAL B. ACKER**
**AARON S. FERREIRA**
Acker & Associates, PC
806 S.W. Broadway, Suite 550
Portland, OR 97205
(503) 228-2495

       Attorneys for Plaintiffs

**LINDA MENG**
Portland City Attorney
**TRACY POOL REEVE**
**ELLEN C. OSOINACH**
Deputy Portland City Attorneys
1221 S.W. Fourth Avenue, Room 430
Portland, OR  97204
(503) 823-4047

       Attorneys for Defendants Randy Leonard, Michael
       Alderman, Jeff Myers, Joseph Botkin, Hank McDonald, and
       City of Portland (hereinafter referred to as City
       Defendants)

**MARTIN C. DOLAN**
**DAVID H. GRIGGS**
Dolan Griggs LLP
1130 S.W. Morrison Street
Suite 630
Portland, OR 97205
(503) 228-7500

       Attorneys for Defendant Portland General Electric

**BROWN, Judge.**

This matter comes before the Court on City Defendants'
Motion (#43) for Summary Judgment.  For the reasons that follow,
the Court **GRANTS** City Defendants' Motion.

## BACKGROUND

At some point in the early 1980s, Plaintiffs purchased

2 - OPINION AND ORDER

property at Fourth Avenue and West Burnside Avenue in Portland, Oregon.  Until November 2007 Plaintiffs Michael and Linda Wright operated Cindy's Adult Bookstore on the property.  Plaintiff Daniel Cosette had limited involvement and Donna Cosette did not have any involvement in the operation of Cindy's.  The record is unclear as to what portion of Cindy's or the property, if any, is owned by Plaintiff The Bookstore, Inc.

Although the property at issue contained two buildings (a one-story building on West Burnside and a two-story building on Fourth Avenue), the buildings shared a common structural wall and interior access, they looked like a single space from the inside, and Plaintiffs often referred to them as one building.  Nevertheless, the buildings were identified as two separate tax lots, had different legal descriptions, and had separate electrical meters.

Cindy's was located on the first floor of the two-story building and was open to the public.  The rest of the two-story building was used for storage, and the one-story building "had been used to construct booths."

On November 29, 2005, the City of Portland Bureau of Fire and Emergency Services (BFE) conducted a routine inspection of the property and required Plaintiffs to "provide annual service to fire extinguishers by [a] certified company" and to "restore lighted exit illumination to exit signs (internal)."  Decl. of

Michael Alderman, Ex. 1 at 2.

On May 31, 2007, Defendant Senior Fire Inspector (FI) Michael Alderman and two other City employees conducted a reinspection of the property to determine whether Plaintiffs had remedied the issues noted in the November 29, 2005, inspection.

According to City Defendants, FI Alderman found "extensive, serious fire code violations" during the May 31, 2007, inspection, which he believed posed "a grave risk to public health and safety." FI Alderman's Fire Inspection History Report for the May 31, 2007, inspection reflected 30 code violations at the property.

After the May 31, 2007, inspection, FI Alderman spoke with members of the Code Compliance Intervention Team (CCIT) about the property. The CCIT is an inter-bureau work group with participation by Portland Fire & Rescue (PF&R), the City of Portland Bureau of Development Services (BDS), and the Portland Police Bureau (PPB) and was formed to address properties that presented heightened public health and safety concerns. According to City Defendants, the CCIT chooses the properties to address by examining a number of factors including code violations, a history of high levels of police and/or fire services, and "exigent circumstances." City Defendants assert the purpose of the CCIT is to coordinate the approach of various City bureaus to properties that pose an elevated risk to public

health and safety and to "comprehensively address" noncompliant
conditions.

CCIT members select properties to bring to the attention of
the team and, in particular, to the attention of Defendant City
Commissioner Randy Leonard who coordinates the work of the CCIT.
Commissioner Leonard makes the final decisions as to which
properties to approve for CCIT work.

Defendant Portland Police Officer Jeff Myers was a member of
the CCIT, and from 2003 to 2009 he worked in the Old Town/
Chinatown neighborhood of Portland where the property was
located.  In that capacity, Officer Myers gained substantial
knowledge of the criminal and nuisance activity and livability
issues in that area.

City Defendants allege that as a result of his community
policing efforts, Officer Myers became aware of substantial
criminal/nuisance activity at Cindy's; knew Cindy's was the
subject of a high level of police services; and suspected, based
on his observations, that Cindy's had building-code violations.
After the May 31, 2007, inspection, Officer Myers brought
Plaintiffs' property to the attention of the CCIT and
Commissioner Leonard.

According to City Defendants, FI Alderman returned to the
property on November 8, 2007, to determine whether the fire-code
violations noted during the May 31, 2007, inspection had been

5 - OPINION AND ORDER

corrected; to show the configuration of the structure to PF&R crews "to avoid injury or death in case they had to respond to a fire there[;] and to explain [to Plaintiffs] that a firewatch was being implemented."  The Fire Inspection History Report for the property reflects "no hazards noted on this date" for November 9, 2007.[1]

Nevertheless, on November 19, 2007, FI Alderman, Defendant BDS Inspector (BDSI) Joe Botkin, and Defendant BDSI Hank McDonald conducted a comprehensive inspection of the property with Officer Myers acting "as an escort."  According to City Defendants, "very serious building and electrical code violations were discovered" at the November 19, 2007, inspection, and, as a result, BDSI Botkin posted a "Dangerous Buildings" notice at the property and sent a written notice to Plaintiffs to repair or to demolish the building.  The notice reflected the various conditions that BDSI Botkin and BDS required Plaintiffs to address:

> The first condition determined to be in violation is as follows (<u>this violation needs to be addressed and resolved prior to correcting subsequent violations listed in this notice</u>):
>
> 1.   Failure of roof system, whereas the roof is in a state of disrepair and water is entering the building and electrical systems. - 29.40.020.B, D, J, & K
>
> * * *

---

[1] Similar notations were made for fire inspections on December 4, 2007, and February 27, 2008.

Other Conditions determined to be in violation are as follows.  These conditions shall be addressed when the roof structure is considered secure from further failure.

1.    Damage to fire separation between addresses (Structural Specialty Code (OSSC) 705.1)- 29.40.020.E, J, & K

2.    Improperly installed threshold for exit door at Burnside Dr. - 29.40.020.K

3.    Failure in drop ceiling system (OSSC 803.3; 803.9). - 29.40.020.B & F

4.    Demolition without permit, electrical system is energized during demolition (OSSC 105; 3303.6). - 29.40.020.E, H & K

5.    Limited energy system(s) installed without properly listed materials, and without permit (Oregon Revised Statute (ORS)). - 29.40.020.K

6.    Open electrical boxes and wiring (National Electrical Code (NEC) 314.25; 314.17). - 29.40.020.K

7.    Misuse of electrical products, use of products not listed for electrical wiring (NEC 110.3). - 29.40.020.K

8.    Use  of cords, plug  strips, and adapters for permanent wiring (NEC 110.3400.9)

9.    Use of cords for fixtures which require permanent connections (exit and emergency lighting (NEC 700.e; 700.12; 700.16,400.9). - 29.40.020.K

10.   Cords run through walls/ceilings (NEC 400.8). - 29.40.020.K

11.   Exit and emergency fixture(s) which are not working (OSSC chapters 10, 11). - 29.40.020.K

12.   Unsafe electrical service (NEC. 110.3; 110.26; 230.70; 230.72; 230.74). - 29.40.020.K

        a)    Main disconnects are not grouped.

        b)    Feeder to unknown location.

        c)    Standing water in front of Service equipment and panelboards.

        d)    Main fuses lack "handle to interconnect unfused service entrance conductors.

13. Plumbing fixtures removed without caps in waste piping (Uniform Plumbing Code (UPC) 301.1.1). – 29.40.020.K

14. Fixtures without proper venting; "S"-traps (UPC 901.0). – 29.40.020.K

15. Damage to storm water piping – water collecting in basement without disposal. – 29.40.020.K

16. Waste piping in need of repair, improper connections to waste system, improper use and/or maintenance of waste system, to the point of an unsanitary condition (UPC 302.0; 304.0; 309.0; 310.1; 310.4). – 29.40.020.K

17. Improperly vented gas appliance. – 29.40.020.K

18. Due to the number of gas appliances that are in disrepair the City of Portland is requiring and [*sic*] evaluation by the Natural Gas Utility of the gas fired appliances for safety. – 29.40.020.K

Botkin Decl., Ex. 2 at 2-3 (emphasis in original).

According to City Defendants, the inspectors found workers doing unpermitted work under dangerous conditions, and, as a result, a Stop Work order was posted and Officer Myers called the Occupational Health and Safety Administration (OSHA) to report the issue.  OSHA later determined the workers were scraping lead

8 – OPINION AND ORDER

paint without protective gear.  Although Plaintiffs contend there were not any workers engaged in unpermitted work under dangerous conditions, Plaintiffs do not dispute OSHA cited them for allowing workers to perform unpermitted work.

BDSI Botkin testified in his Declaration that during the November 19, 2007, inspection he noticed "the electrical service equipment and main disconnect was located in a basement area which had several inches of standing water immediately below and in front of it . . . [and] there was no clear, safe way to disconnect electrical power to the properties."  Botkin Decl. ¶ 16.  BDSI Botkin was aware the building was actually two connected buildings, but "it was not possible [to] determine the configuration of the electrical system because the components were not labeled . . . and exit the room via interior walls."  Botkin Decl. ¶ 17.  Accordingly, it was BDSI Botkin's "professional judgment that the electrical systems of the two buildings could not be separated in terms of disconnecting the power."  Botkin Decl. ¶ 17.  BDSI Botkin, therefore, contacted the City's Chief Electrical Inspector and, based on the information and photographs BDSI Botkin provided, the Chief Inspector agreed to prepare a request to Defendant Portland General Electric (PGE) to disconnect the power at the property immediately.  The request was transmitted to PGE on November 20, 2007.

9 - OPINION AND ORDER

On November 20, 2007, BDSIs McDonald and Botkin returned to the property to clarify questions about the condition of the property and to ensure that work on the property had been halted in response to the Stop-Work order.

On November 21, 2007, PGE shut off electrical power to both properties.

At each of the inspections on May 31, November 8, November 19, and November 20, 2007, Paul Elder, the manager and person in charge of Cindy's, consented to the entry of City Defendants to inspect the property and used his keys to unlock secured areas within the buildings for inspection by the City Defendants.

On December 4, 2007, BDSI Botkin was outside the building when a contractor, who identified himself as the roofing contractor and who advised BDSI Botkin that he was going to bid the repairs for Plaintiffs, asked BDSI Botkin to examine the roof and to consult with him as to any roof issues. BDSI Botkin and the contractor examined the roofs of both buildings. During the examination BDSI Botkin found "the exposed portion of the two story wall was leaning in excess of what is allowed under Title 29 of the Portland City Code and that the exposed structural beams were compromised." Botkin Decl. ¶ 22. As a result, BDSI Botkin sent a Dangerous Structure Progress Report to Plaintiffs noting the following violations as to the two-story building:

10 - OPINION AND ORDER

    1.    Brick masonry wall including chimneys listing and leaning.  29.40.020.C

    2.    Failure at connections and rotting in beams from 2-story portion of structure to masonry wall.  29.40.020.B

    3.    Grout 1 mortar missing in masonry wall.  29.40.020.G

    4.    Electrical wiring on exterior of building: improper use of electrical products installed in improper and unsafe manner.  29.40.020.K (NEC 110.2, 3, 7, and 12).

Botkin Decl., Ex. 6 at 1.

According to City Defendants, Officer Myers and FI Alderman were at the exterior of the property on December 4, 2007, and were advised by an individual that an alarm was going off inside one of the buildings.  FI Alderman and PF&R personnel entered the property to check for fire, but at that point the alarm had ceased and a fire was not found.  Plaintiffs, however, contend FI Alderman and Officer Myers "pretended to hear an alarm as false justification for entering the Properties [*sic*] to look for other ways to selectively use code violations as a pretext to cause problems for Plaintiffs."

Michael Wright testified in his Examination Under Oath (EUO) that he received a telephone call in May 2008 from a person who used to work for Cindy's.  That person told him that it looked like someone "had been prying on the siding of the building," so he went to look at it.  Wright "found the roof had collapsed.

11 - OPINION AND ORDER

And through collapsing of that roof, it had forced some of that wall to push out from the building." Decl. of Tracy Pool Reeve, Ex. 3 at 12-13.

On July 15, 2008, at 2:00 p.m., FI Alderman was walking down the sidewalk of West Burnside when he saw a large hole in the wall of that portion of the property located on West Burnside. On closer examination it appeared to FI Alderman that a 4x8-foot piece of siding and part of the framing structure had been pulled away from the wall creating an opening into the interior of the building. FI Alderman became concerned that someone might have crawled in the opening to seek shelter or to do drugs. FI Alderman called Michael Wright, and Wright informed him that the roof had collapsed causing damage to the siding and creating the opening. Wright gave FI Alderman permission to enter the building to make sure it was vacant. At that point, FI Alderman called PF&R to the scene. PF&R determined it would be too dangerous to enter the building through the opening. FI Alderman, therefore, called Wright again and told him that he observed approximately thirty percent of the roof had caved in and he believed the building to be unstable and an imminent hazard. A short time later, Wright's attorney contacted FI Alderman, denied FI Alderman permission to enter the building, and advised FI Alderman that neither counsel nor Wright would come to the building to assist.

12 - OPINION AND ORDER

Notwithstanding this exchange, FI Alderman and PF&R entered the building at 4:30 p.m. on July 15, 2008, and searched for occupants because they believed the building was dangerously unsafe.  FI Alderman made arrangements to cordon off the sidewalks adjacent to the building and to close the right-turn lane from West Burnside Avenue to N.W. Fourth Avenue. FI Alderman also made arrangements to have structural engineers meet him at the property the following morning.

On July 16, 2008, FI Alderman returned to the property with members of Portland Department of Transportation, BDS, PPB, and PF&R.  They discovered the front door to Cindy's was unlocked and feared transients or drug users could have entered the building. FI Alderman and PF&R employees entered the building to search for occupants.  They did not find any, left the building, and locked the front door.

Shortly thereafter Plaintiffs obtained a demolition permit and demolished the building.

On November 17, 2009, Plaintiffs filed an action in Multnomah County Circuit Court in which they brought claims against all City Defendants under § 1983 for unreasonable search and seizure and violation of their rights to equal protection. Plaintiffs also brought state-law claims against the City of Portland for (1) trespass, (2) invasion of privacy, and (3) negligence.  Plaintiff The Bookstore also brought a claim

13 - OPINION AND ORDER

against the City of Portland for intentional interference with economic relations.  In addition, Plaintiffs brought a claim against PGE for negligence.

On December 21, 2009, Defendants removed the matter to this Court on the basis of federal-question jurisdiction.

On January 8, 2010, PGE filed a Motion to Dismiss Plaintiffs' claim against it.  On March 30, 2010, the Court heard oral argument on PGE's Motion and denied it on the record.

On September 27, 2011, City Defendants filed a Motion for Summary Judgment as to all of Plaintiffs' claims against them. On February 17, 2011, the Court heard oral argument on Defendants' Motion.  On that same day, the Court issued an Order in which it noted Plaintiffs had withdrawn their § 1983 claim against City Defendants for unreasonable search and seizure as well as their state-law claims against the City of Portland for trespass and invasion of privacy and their claim against PGE for negligence.  Accordingly, the only remaining claims are Plaintiffs' claim against City Defendants under § 1983 for violation of Plaintiffs' right to equal protection, Plaintiffs' state-law claim against the City of Portland for negligence, and The Bookstore's state-law claim against the City of Portland for intentional interference with business relations.

14 - OPINION AND ORDER

## STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id*.

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Id*. "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)). When the nonmoving party's claims are factually implausible, however, that party must "come forward with more persuasive evidence than otherwise would be necessary." *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as*

*amended by* 410 F.3d 1052, 1055 (9th Cir. 2005) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*


## DISCUSSION

City Defendants seek summary judgment as to all of Plaintiffs' remaining claims.

## I.  Plaintiffs' equal-protection claim

Plaintiffs assert City Defendants violated their right to equal protection when they placed Plaintiffs' property on the CCIT list and "caused the selective, aggressive enforcement of building codes and other laws and regulations against Plaintiffs compared to property owners and businesses not on the [CCIT] list."  Plaintiffs, therefore, allege a "class-of-one," equal-protection claim.

The Ninth Circuit has noted the "class-of-one" theory of equal protection

> is unusual because the plaintiff in a "class of one" case does not allege that the defendants discriminate against a group with whom she shares characteristics, but rather that the defendants simply harbor animus against her in particular and

> therefore treated her arbitrarily. *See N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008)("When an equal protection claim is premised on unique treatment rather than on a classification, the Supreme Court has described it as a 'class of one' claim."[]) (citing *Olech*, 528 U.S. at 564, 120 S. Ct. 1073)). Such circumstances state an Equal Protection claim because, if a state actor classifies irrationally, the size of the group affected is constitutionally irrelevant. *Olech*, 528 U.S. at 564, 120 S. Ct. 1073.

*Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008).

> To succeed on [a] "class of one" claim, [the plaintiff] must demonstrate that [the defendants]: (1) intentionally (2) treated [the plaintiff] differently than other similarly situated property owners, (3) without a rational basis. *Willowbrook*, 528 U.S. at 564, 120 S. Ct. 1073; *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008). Although [the plaintiff] must show that [the defendants'] decision was intentional, he need not show that [the defendants'] were motivated by subjective ill will. *Willowbrook*, 528 U.S. at 565, 120 S. Ct. 1073 (rejecting the interpretation that a plaintiff must allege that the governmental action was the result of subjective ill will in a "class of one" claim).

*Gerhart v. Lake County, Mont.*, No. 10-35183, 2011 WL 923381, at *7 (9th Cir. Mar. 18, 2011). "A class of one plaintiff must show that the discriminatory treatment 'was intentionally directed just at him, as opposed . . . to being an accident or a random act.'" *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008)(quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)).

The parties agree the Court must analyze City Defendants'

17 - OPINION AND ORDER

conduct using a rational-basis standard because neither a suspect classification nor a fundamental right is implicated in this matter. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988).

"Selective enforcement of valid laws, without more, does not make the defendants' action irrational." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1188 (9th Cir. 1995)(citations omitted). To establish an equal-protection claim, the asserted rational basis for selectively enforcing the law must also be a pretext for an impermissible motive. *Id.*

### A.   Similarly-situated businesses

City Defendants assert Plaintiffs' equal-protection claim fails because Plaintiffs cannot establish they were intentionally treated differently than similarly-situated persons. Specifically, City Defendants note Plaintiffs do not point to any property with the same type and degree of fire-code and building-code violations that was not placed on the CCIT list nor do Plaintiffs identify any property owner on the CCIT list that was treated differently than Plaintiffs.

Plaintiffs conceded at oral argument that they did not have any comparator properties to support their position. Plaintiffs instead asserted "anyone in that target list potentially has some claims because they're being unfairly targeted."

18 - OPINION AND ORDER

Even with class-of-one, equal-protection claims a "plaintiff still bears the burden of proving that she 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9ᵗʰ Cir. 2005)(quoting *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9ᵗʰ Cir. 2002)). *See also Johnson v. Goddard*, No. CV-07-0175-PHX-FJM, 2007 WL 2701951, at *2 (D. Ariz. Sept. 13, 2007)("A plaintiff [alleging a violation of his right to equal protection] must allege sufficient facts to indicate that his comparators were similarly situated in all relevant respects.").

In *Johnson* the court granted the defendant's motion to dismiss the plaintiff's equal-protection claim:

> [The plaintiff] also claims that the University of Arizona was treated more favorably when it cleared land without conducting environmental impact studies but was not assessed fines or penalties . . . . These allegations, however, do not establish that the University was similarly situated "in all relevant respects." *Nordlinger*, 505 U.S. at 10, 112 S. Ct. at 2331. [The plaintiff] fails to assert that the University committed violations similar to those with which he is charged, namely damage to protected archaeological sites, destruction of wildlife, or polluting state waterways. Therefore, [the plaintiff] has failed to allege that a similarly situated individual or entity has been treated more favorably.

2007 WL 2701951, at *2. Similarly, in *Hoffman v. Jefferson County* the court granted the defendants' motion for summary

judgment as to the plaintiffs' equal-protection claim on the
ground that "plaintiffs fail[ed] to submit any facts to . . . to
show that the County defendants intentionally and without
rational basis treated them differently from similarly-situated
landowners."  Civ. No. 09-204-AA, 2010 WL 5463176, at *3 (D. Or.
Dec. 22, 2010)(citing *Cordi-Allen v. Conlon*, 494 F.3d 245, 251-52
(1st Cir. 2007)("It is inadequate merely to point to nearby
parcels in a vacuum and leave it to the municipality to disprove
conclusory allegations that the owners of those parcels are
similarly situated.")).  *See also Honokaia 'Ohana v. Park*, Civ.
No. 09-00395 ACK-LEK, 2010 WL 4273083, at *8 (D. Haw. Oct. 25,
2010)(the court granted the defendants' motion for summary
judgment as to the plaintiff's equal-protection claim because the
plaintiffs "fail to demonstrate that the Honokaia lessees and the
Kealakehe developer were similarly situated.  That the Honokaia
and Kealakehe subdivisions were both DHHL projects does not make
them similarly situated. . . .  To the contrary, Plaintiffs are
lessees of pasture lots developed by DHHL for pasture and related
homesteading purposes while the lessee at Kealakehe is a private
developer selected to develop commercial land in order to
generate revenue for DHHL's homesteading programs.").  Pursuant
to *Thornton, Johnson, Hoffman,* and *Honokaia*, the Court concludes
Plaintiffs' general assertion that they are being treated
differently than owners of similarly-situated properties because

their property was placed on the CCIT list is not sufficient to
establish that City Defendants violated Plaintiffs' right to
equal protection.

In their Response to City Defendants' Motion for
Summary Judgment, Plaintiffs also point to that portion of BDSI
Botkin's deposition in which he testified his November 19, 2007,
inspection of the property was unusual because he was instructed
to make a "complete and thorough inspection of the building."
Plaintiffs assert BDSI Botkin was never directed to perform a
complete and thorough inspection on any other existing building,
and, therefore, City Defendants "admit to intentionally treating
Plaintiffs differently from other property owners."

Plaintiffs, however, mischaracterize BDSI Botkin's
testimony.  BDSI Botkin testified at deposition that the first
time he was asked to conduct a complete and thorough inspection
of a property was at Plaintiffs' building, but he was directed to
conduct complete and thorough inspections of other properties
after that first time.  In his Second Declaration, BDSI Botkin
testified his November 19, 2007, inspection of Plaintiffs'
property was "the first inspection I had conducted utilizing or
as part of the team approach that became known as CCIT."  Botkin
Second Decl. at ¶1.  Accordingly, the fact that BDSI Botkin had
not been told to do a complete and thorough inspection before his
inspection of Plaintiffs' property does not indicate

21 - OPINION AND ORDER

City Defendants treated Plaintiffs differently.

Plaintiffs also point to Commissioner Leonard's testimony at deposition that "there would have been a lot more buildings subject to that enforcement" if the CCIT team had adopted specific criteria for enforcement. Acker Decl., Ex. 4 at 10. According to Plaintiffs, Commissioner Leonard's testimony indicates Plaintiffs were treated differently than a large number of similarly-situated property owners. As the Court noted at oral argument, however, Commissioner Leonard's testimony does not establish Plaintiffs were treated differently than similarly-situated property owners but merely that the CCIT did not have set criteria to evaluate properties for placement on their list.

Accordingly, the Court concludes Plaintiffs have not provided any evidentiary record from which rational jurors could conclude the City Defendants violated Plaintiffs' rights to equal protection by treating Plaintiffs differently than similarly-situated property owners.

**B.   Rational basis**

Even if Plaintiffs establish they were treated differently than similarly-situated individuals, City Defendants also assert they had a rational basis for their actions; *i.e.*, the property was assigned to the CCIT list because it had substantial, dangerous fire-code violations; the property required high levels of police services in the past due to

22 - OPINION AND ORDER

criminal and nuisance activity; and the property was suspected of having significant building-code violations.

City Defendants point out that the Ninth Circuit has held cities have "an obvious interest in preventing safety and sanitation hazards by enforcing the housing code." *Armendariz v. Penman*, 75 F.3d 1311, 1328 (9th Cir.1996), *overruled on other grounds by Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 856-57 (9th Cir.2007). The Ninth Circuit, however, has made clear that when evaluating the rational-basis requirement, courts must "analyze[] whether there was a rational basis for treating [the plaintiff] differently." *Gerhart*, 2011 WL 923381, at *8 (emphasis omitted). "We have recognized that the rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government *action*." *Id.* (emphasis in original). Thus, the issue is whether City Defendants had a rational basis for placing Plaintiffs' property on the CCIT list.

As noted, City Defendants assert they had a rational basis for assigning the property to the CCIT list because it had substantial, dangerous fire-code violations; it had required high levels of police services in the past due to criminal and nuisance activity; and it was suspected of having significant building-code violations. Plaintiffs, however, contend City Defendants' reasons for placing Plaintiffs' property on the CCIT

23 - OPINION AND ORDER

list are mere pretext.

      **1.    Timing of the May 31, 2007, inspection**

        Plaintiffs assert the property had been on a two-year fire-inspection cycle before the May 31, 2007, inspection, and there was not any legitimate reason for FI Alderman to inspect the property six months early. FI Alderman, however, testified at deposition that the May 31, 2007, inspection was a reinspection rather than a run-of-the-mill scheduled inspection. Plaintiffs do not identify any evidence in the record that shows City Defendants failed to reinspect other properties within 18 months that had similar fire-code violations, that it was unusual or irregular for City Defendants to reinspect a property that has fire-code violations after only 18 months, or that reinspections of Plaintiffs' property were limited to a two-year rotation. In fact, the Fire Inspection History Report reflects Plaintiffs' property was inspected and/or reinspected more irregularly than every two years. Specifically, the Report reflects the property was inspected on the following dates before May 31, 2007: June 10, 1986; June 3, 1992; June 18, 1992; June 23, 1993; July 16, 1993; February 9, 1995; March 19, 1996; September 4, 1999; October 1, 2001; November 27, 2001; January 29, 2004; and November 29, 2005.

        On this record the Court does not find any factual basis to infer from the timing of the May 31, 2007, inspection

that City Defendants' action was pretextual or that City
Defendants lacked a rational basis when they placed Plaintiffs'
property on the CCIT list.

### 2.    Criminal activity

Plaintiffs contend the alleged criminal activity
at Cindy's cited to by City Defendants to support their actions
"was largely caused by Defendant Myers 'self-initiated' reports."
Specifically, Plaintiffs assert Officer Myers would park in view
of the property and  "wait for criminals to enter before taking
enforcement action."

As City Defendants note, however, testimony by
Elder and Plaintiffs establishes criminal activity occurred at
the property over at least 15 years.  For example, Elder
testified at his deposition as follows:

> Q.    Were crack users using the store as a
>       haven?
>
> A.    Oh, yes.
>
> Q.    Can you explain more about that so I can
>       understand?
>
> A.    Okay.  This was an adult bookstore.
>       Part of an adult bookstore is adult
>       movie -- an adult movie arcade, which
>       are little private rooms where a person
>       can go in and watch a movie.  Well,
>       that's a very private thing.  Naturally
>       it would be an easy place for a crack
>       user to do the drug in private.  There's
>       no one there.
>
> Q.    And did that happen at Cindy's?

        A.    Yes, it did happen at Cindy's.

                        * * *

        Q.    So when you were finding these crack
              pipes once a week, approximately what
              time period would you say?

        A.    Through most of the time I was working
              there.

        Q.    Okay. I guess I didn't ask.  What time
              period were you working there?

        A.    Oh, for about 15 years before it closed.

Second Decl. of Tracy Pool Reeve, Ex. 4 at 2-3.  Elder also

testified he "understood Officer Myers' [*sic*] concerns as a

police officer that there was drug activity at Cindy's" and

"shared his concerns."  Reeve Second Decl., Ex. 4 at 7.

        Michael Wright testified at deposition that he had

witnessed customers trying to "inject themselves with intravenous

drugs" at Cindy's and he immediately threw them out.  He had also

seen people try to break into "booths" at Cindy's and try to get

money as well as smoke crack cocaine, which also caused those

customers to be ejected.  Reeve Second Decl., Ex. 1 at 3-5.

Linda Wright testified at deposition that she had to ask people

to leave Cindy's because she believed they were soliciting or

using illegal drugs.  Reeve Second Decl., Ex. 2 at 2.  Even when

viewed in the light most favorable to Plaintiffs, the record

reflects criminal activity occurred fairly regularly at Cindy's

apart from any alleged "self-initiated" reports by Defendant
Myers.

Moreover, as the Court noted at oral argument,
Defendant Myers is expected to engage in self-initiated activity
as a police officer and to look for crime rather than merely wait
for calls.  The record reflects PPB Officers are expected to
engage in community policing such as identification of areas with
potential crime issues and to address those issues proactively
rather than waiting for calls to come into PPB.  Officer Myers
testified in his Declaration that he acquired anecdotal
information through his community-policing duties that
prostitution was occurring regularly at Cindy's as well as
information from other business owners and operators and other
individuals in the area that Cindy's "was the focus of a large
amount of nuisance activity, including drugs and prostitution."
Myers Decl. ¶¶ 20-21.

Accordingly, the Court concludes the record does
not permit the inference that City Defendants' concerns about
crime at the property were pretextual or that City Defendants
lacked a reasonable basis to place the property on the CCIT list
partly in an effort to address criminal activity that occurred at
the property.

### 3.    Officer Myers's alleged animus as evidence of pretext

Finally, Plaintiffs assert in their Complaint that

27 - OPINION AND ORDER

the reasons for City Defendants' actions were personal animus by
Commissioner Leonard against adult bookstores and his desire to
force Plaintiffs to sell so he or his associates personally could
buy and develop the property.  At summary judgment, however,
Plaintiffs asserted the property was placed on the CCIT list
because Officer Myers had personal animus towards Michael Wright
based on an interaction Officer Myers had with Michael Wright in
a bar.

Plaintiffs do not identify any evidence in the
record to support the allegations in their Complaint of personal
animus by Commissioner Leonard (or any Defendant other than
Officer Myers) or that Commissioner Leonard desired to purchase
and to develop the property himself.  Plaintiffs merely assert in
their Response that the CCIT "receives funding from a private
group of businesses from the Old Town neighborhood."  The Court
notes City Defendants rely on five declarations as well as
deposition testimony to establish that Commissioner Leonard did
not intend to put Cindy's out of business so that he, his
friends, his family, and/or his business associates could acquire
and develop Plaintiffs' property.  The Court concludes
Plaintiffs' assertion is not sufficient to refute City
Defendants' evidence or to establish a genuine dispute of
material fact exists as to Commissioner Leonard's alleged animus.

As to alleged animus by Officer Myers, Michael

Wright testifies in his Declaration as follows:

> The first time that I met Defendant Myers, we
> were at a bar.  Defendant Myers had been
> telling Cindy's store clerks that they were
> not doing their job.  I demanded that
> Defendant Myers stop bothering Cindy's
> managers and only discuss issues relating to
> Cindy's with me.  I attempted to give my
> telephone number to Defendant Myers, but he
> refused and told me to not talk to him.  I
> responded, "Then don't talk to my clerks."
> During this exchange, we were both shouting
> and exchanging foul language. Myers was
> visibly upset by the confrontation.

Wright Decl. ¶ 20.

Assuming Wright's interaction with Officer Myers
occurred as Wright recalls in his Declaration, it is speculative
to infer that interaction establishes that animus against
Plaintiffs by Officer Myers resulted in placement of Plaintiffs'
property on the CCIT list.  Even though Officer Myers brought
Plaintiffs' property to the attention of the CCIT, the record
reflects Officer Myers was not the final decisionmaker.  In fact,
it appears undisputed that Commissioner Leonard made the final
decisions as to which properties were placed on the CCIT list
and, specifically, the final decision to place Plaintiffs'
property on that list.  As noted, there is not any evidence in
the record that Commissioner Leonard had any personal animus or
bias towards Plaintiffs or their property.

In addition, there is not any evidence in the
record that Officer Myers issued any of the fire- or building-

code citations to which Plaintiffs point as the alleged selective enforcement.  FI Alderman and BDSIs Botkin and McDonald issued the fire- and building-code citations, and there is not any basis to infer that Officer Myers and his alleged animus affected their decisions.

Finally, it is questionable whether a single interaction of the kind alleged by Plaintiffs is sufficient to establish animus or pretext.  For example, in *David Hill Development, LLC v. City of Forest Grove*, the court found the plaintiff established a genuine dispute of material fact existed with respect to the question of pretext because the record reflected

> [t]he sewer routing proposed by Plaintiff should have been a concern for Defendants only if it presented maintenance issues that would affect the City in the future, but . . . Defendants' disapproval of Plaintiff's proposed sewer alignment was influenced by the interests of other developers. . . .  The record further demonstrates that Defendants held McDonald in low esteem and wished to thwart his efforts.  Various people involved in the development have allegedly expressed their apprehension about testifying against Defendants and in favor of Plaintiff.  A string of emails also suggests that Defendants wanted to find a way to legally deny building permits to Plaintiff for as long as possible. Finally, Defendants ordered Plaintiff to remove and replace trees with an inappropriate branch height, despite the fact that other developments were allowed to keep trees that were not in compliance.

688 F. Supp. 2d 1193, 1215 (D. Or. 2010).  Similarly, in *Armendariz v. Penman* the Ninth Circuit concluded with respect to

30 - OPINION AND ORDER

the plaintiffs' equal-protection claim that the plaintiffs had
"raised a triable issue of fact as to whether the defendants'
asserted rationale of directing efforts to enforce the housing
code at high-crime areas was merely a pretext."  75 F.3d 1311,
1327 (9th Cir. 1996), *overruled on other grounds by Crown Point
Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 852-53 (9th Cir.
2007).  The court noted:

> In response to the defendants' motion for summary
> judgment, the plaintiffs relied primarily on an
> affidavit submitted by John Edwins, a commercial
> developer, to support their claim that the
> defendants were motivated by a desire to acquire
> the plaintiffs' properties and replace the
> low-income housing units with commercial
> development.  Edwins stated that he had met with
> Holcomb, Penman, and other city officials to
> discuss and plan a proposed commercial center on
> property then occupied by the plaintiffs'
> buildings.  According to Edwins, Holcomb wanted to
> demolish or relocate the plaintiffs' buildings and
> replace them with commercial development and asked
> Edwins to purchase the buildings as a third party
> "strawman" so that the City's Redevelopment Agency
> could subsequently purchase them from him.  In an
> effort to mitigate the City's costs of relocating
> the buildings' tenants and to suppress the value
> of the plaintiffs' properties, Edwins, Holcomb,
> and Penman discussed methods of preventing the
> plaintiffs from renting currently vacant
> apartments to tenants.  Edwins suggested the
> possibility of removing the utility meters from
> unoccupied buildings; once the meters were
> removed, the plaintiffs could not rent the
> apartments without applying to the City for
> permits.  On December 6, 1990, at the request of
> Holcomb, Edwins delivered to Penman an inventory
> of buildings from which meters could possibly be
> removed.
>
> Only five days later, two investigators who work
> under Penman's supervision accompanied two housing

> code enforcement officers to the Arden-Guthrie
> area for a "cursory inspection."  When the sweeps
> began about a month later, the first 35 buildings
> swept were, with two exceptions, the buildings
> included on Edwins' list provided to Penman.

*Id.*

Officer Myers's alleged interaction with Wright does not rise to the level that other courts have found necessary to constitute animus or to show pretext.  On this record the Court concludes City Defendants have shown they had a rational basis for placing Plaintiffs' property on the CCIT list and Plaintiffs have not established a genuine dispute of material fact exists as to pretext.

In summary, the Court concludes no reasonable juror could conclude City Defendants intentionally treated Plaintiffs differently than other similarly-situated property owners without a rational basis.  Accordingly, City Defendants did not violate Plaintiffs' rights to equal protection, and the Court grants City Defendants' Motion for Summary Judgment as to Plaintiffs' equal-protection claim.

## II.  The Bookstore's claim for intentional interference with a business relationship

Plaintiffs allege City Defendants intentionally interfered with The Bookstore's "existing and prospective relationships" with its customers and prospective customers with the "improper motive" of embarrassing and harassing The Bookstore and its customers and/or "with the improper means" of intentionally

32 - OPINION AND ORDER

interfering with Plaintiffs' business relations by violating Plaintiffs' rights to equal protection under Oregon common law.

City Defendants concede for purposes of their Motion for Summary Judgment that The Bookstore had a business relationship with its customers and/or prospective customers. City Defendants, however, assert Plaintiffs cannot establish any interference by City Defendants through an improper means or for an improper purpose.

Under Oregon law the elements of a claim for intentional interference with a business relationship are:

> (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage); (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages.

*Allen v. Hall*, 328 Or. 276, 281 (1999). *See also Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 477 (2009)(same).

> A showing of interference alone is not enough: "[d]eliberate interference alone does not give rise to tort liability." *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 982 P.2d 1117, 1124 (Or. 1999). Improper means or purpose may be wrongful by "reason of statutory law or common law, and include 'violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation, and disparaging falsehood.' That is, the means must be wrongful in some manner other than simply causing the damages claimed as a result of the conduct." *Douglas Med. Ctr., LLC v. Mercy Med. Ctr.*, 125 P.3d 1281, 1289 (Or. 2006)(citing *Conklin v.*

> *Karban Rock, Inc.*, 94 Or. App. 593, 601, 767 P.2d
> 444, *rev. den.*, 773 P.2d 774 (1989)).

*MLM Prop., LLC v. Country Cas. Ins. Co.*, No. CV 06-3048-CL, 2010
WL 678149, at *4 (D. Or. Feb. 25, 2010).   An interference

> may be privileged or legitimate such that the
> interferor avoids liability.   Courts look to
> purpose or motive as a controlling factor in that
> circumstance:   "[i]f he is promoting an interest
> which is equal or superior in social value to that
> with which he interferes, his actions are said to
> be privileged or justified." *Wampler v.*
> *Palmerton*, 439 P.2d 601, 606 (Or. 1968).
> "Generally a defendant's subjective judgment as to
> its own business purposes will control."
> *Northwest Natural Gas Co. v. Chase Gardens, Inc.*,
> 982 P.2d 1117, 1124 (Or. 1999)(citing *Top Service*
> *Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d
> 1365, 1370 (Or.1978)).

*Id.*

At oral argument the parties conceded the analysis of
improper means and improper purpose is similar to the analysis of
pretext as to Plaintiffs' equal-protection claim.   Thus, a
failure to make the required showing of pretext as to Plaintiffs'
equal-protection claim would also result in a failure to
establish improper means or improper purpose as to Plaintiffs'
claim for intentional interference with a business relationship.
The Court agrees.

Because the Court concludes Plaintiffs did not establish
pretext in the context of their claim for equal protection, the
Court also concludes Plaintiffs have not established City
Defendants acted with improper means or improper purpose when

34 - OPINION AND ORDER

they placed Plaintiffs' property on the CCIT list.  The Court,
therefore, grants Defendants' Motion for Summary Judgment as to
Plaintiffs' state-law claim for intentional interference with a
business relationship.

**III. Plaintiffs' negligence claim**

Plaintiffs allege in their Complaint that Defendant City of
Portland "wrongfully and mistakenly ordered Defendant PGE to shut
off power to the West Burnside property."[2]  As a result, an
"electricity-powered pump that removed standing water from the
roof in the event that the roof's drain became clogged" lost
power and stopped working, rainwater accumulated on the roof, and
the roof collapsed.

The City contends (1) it was not negligent in shutting off
the power to both buildings on the property, (2) its decision to
turn off the power is protected by discretionary immunity, and
(3) lack of electricity was not the proximate cause of the roof
collapse.

Under Oregon law, "[t]o state a claim in negligence, a
plaintiff must allege facts  . . . that show . . . the defendant
owed a duty of care, . . . the defendant breached the duty and
. . . the breach was the cause in fact of some legally cognizable
damage to plaintiff." *Cook v. Sch. Dist. UH3J*, 83 Or. App. 292,

---

[2] Plaintiffs do not bring any claims related to turning off
the power at the Fourth Avenue property.

294 (1987)(citation omitted).

**A.    Turning off the electricity to both buildings rather than to the West Burnside building only**

As noted, the City contends Plaintiffs cannot establish the City was negligent when it turned off the electricity to the West Burnside building after determining it was necessary to turn off the electricity at the Fourth Avenue building.  Even though the properties technically constituted two buildings for tax-lot purposes, the record reflects the buildings were interconnected and were used as a single space.  In addition, BDSIs Botkin and McDonald testify in their Declarations that they concluded during the November 19, 2007, inspection that the electrical system at the property was extremely hazardous.  Botkin Decl. ¶14; McDonald Decl. ¶ 9.  BDSI Botkin testified:

> Another aspect of the electrical system which I believed to present an extreme hazard was the fact that the electrical service equipment and main disconnect was located in a basement area which had several inches of standing water immediately below and in front of it.  In addition, there was no clear, safe way to disconnect electrical power to the properties.
>
> I am aware that there were two, connected buildings on the site.  Based upon my inspection, it appeared that both properties were served through the electrical system in the basement with the standing water.  However, it was not possible determine the configuration of the electrical system because the components were not labeled (itself a code violation) and exits the room via interior walls.  As a result, it was my professional judgment that the electrical

> systems of the two buildings could not be
> separated in terms of disconnecting the
> power.

Botkin Decl. ¶¶ 16-17.  Similarly, BDSI McDonald testified:

> During our inspection, we found very serious
> code violations at the property.  In fact,
> conditions with the electrical system were so
> hazardous that we determined it was necessary
> to request emergency disconnection by PGE.
> We also posted a stop work order and
> dangerous buildings notice.  Water was
> leaking through the roof in close proximity
> to live electrical wiring in the second floor
> of the structure.  Workers were conducting
> what appeared to be interior demolition
> activity in this area, where the electrical
> wiring had supposedly been de-energized but
> in fact was not (as we discovered when a
> worker hit an energized electrical wire with
> a shovel).  There was standing water in the
> basement directly in front of the energized
> electrical service panels.  It was not
> possible to determine the switching from
> these service panels.
>
>                      * * *
> From my examination of the electrical system,
> it was not possible to identify separate
> electrical service to each of the buildings.
> The electrical services were interconnected
> and extremely difficult to trace.  It was my
> professional judgment that the electrical
> systems of the two buildings could not be
> readily separated in terms of disconnecting
> the power.

McDonald Decl. ¶¶ 9, 13.

The record reflects BDSI Botkin is licensed by the State of Oregon as a Supervising Electrician and holds certifications as Commercial and Residential Inspector for Structural, Mechanical, Electrical Plan Review, and Residential

37 - OPINION AND ORDER

Plumbing Inspector.  He began an electrical apprenticeship program in 1981, became a Journeyman Electrician in 1986, and became a Supervising Electrician in 1992.  BDSI Botkin worked as an electrician before he began working for the City of Portland in 1999.  In short, BDSI Botkin had 15 years of experience as an electrician at the time of the November 2007 inspection and was well qualified to examine and to determine the safety of an electrical system as well as to determine whether it was possible to shut off power safely any way other than through a request to PGE.

BDSI McDonald was the Building Official for the City of Hermiston and was self-employed.  He contracted with various Oregon jurisdictions for building-inspection services and code-interpretation applications before he began working for the City of Portland in 1999.  He holds an Associate's degree in Industrial Technology as well as a State of Oregon Building Officials' Certification, a Level Structural Inspector Certification, a Level Mechanical Inspector Certification, a Level Plumbing Inspector Certification, a Level Plans Examiner and Fire/Life Safety Plans Examiner Certification, and other certifications.  In 1999 BDSI McDonald began working for the City of Portland as a Structural Mechanical Inspector.  He became a Senior Structural Mechanical Inspector in 2001, was promoted to Section Manager of the Fire and Life Safety Plans Examiners in

2004, and became the Section Manager over the Facility Permit Program in 2008.  Accordingly, at the time of the November 2007 inspection, BDSI McDonald was well qualified to examine and to determine the safety of electrical systems and the feasibility of safely shutting off power in some manner other than a request to PGE.

Finally, both BDSI Botkin and BDSI McDonald believed in their professional opinions that the electrical-system conditions at the Fourth Avenue portion of the property were hazardous, that it was not possible to trace the interconnected electrical systems of the buildings, and that it was not readily apparent how to separate the electrical systems of the buildings for purposes of shutting off power to the Fourth Avenue portion of the property.

Plaintiffs do not identify any expert or other evidence in the record that contradicts or calls into question the assessments of BDSIs Botkin and McDonald regarding the hazardous nature of the electrical system at the property, the interconnectedness of the property's electrical systems, or their inability to separate the electrical systems for purposes of shutting off the power.  Plaintiffs merely note the properties are identified as separate tax lots, have different legal descriptions, and have separate electrical metering.  These facts are not sufficient to refute City Defendants' testimony or to

establish a material dispute of fact exists as to the dangerous conditions at the property or as to the inability of BDSIs Botkin and McDonald to determine how to shut off the power safely to the Fourth Avenue property only.

The Court, therefore, concludes Plaintiffs have not established the City breached any duty of care owed to Plaintiffs with respect to electrical power at the property.

**B.    Causation**

Even if the Court concluded the City breached its duty of care to Plaintiffs when it had the electricity turned off to both buildings, the City contends it would still be entitled to summary judgment as to Plaintiffs' negligence claim because Plaintiffs have not established the lack of electricity to the sump pump on the roof of the West Burnside property caused the roof to collapse.

Specifically, the City notes even though there was an electrically powered sump pump on the roof of the West Burnside building, Michael Wright testified at deposition as follows:

> A    There was a small emergency sump pump that could be used if a problem were encountered with water accumulation on the building.  It was not an active full-time thing.  It would be a backup thing if you needed to get some water off the roof.  Kind of like a basement-type sump pump type thing.
>
> Q    The sump pump, did you put it in?
>
> A    I put it up there, yes, ma'am.

Q    When did you do that?

A    Oh, God. Maybe ten, twelve years ago.

                    *  *  *

Q    And what was the purpose of the pump?  I know
     it's to pump water, but --

A    Yeah. It would if there would become an
     accumulation of water on the roof, I could
     plug that pump in and pump that water off the
     roof. I did not have an occasion to do that,
     but I had it there.

Q    How many times a year would you do that?

A    Do what?

Q    Pump water off the roof.

A    I had not used that pump to pump water off
     the roof.

Q    Oh, you never used it?

A    No.  It was never necessary.

Q    So where did the water go when it was on the
     roof?

A    Through the gutter and draining system of the
     roof itself.

Q    Is that what potentially would get clogged
     with leaves?

A    Yes.

Q    So that's why you had leaves taken off?

A    Yes.  Correct.

Q    If you didn't ever use the such pump, how do
     you know it worked?

41 - OPINION AND ORDER

> A    It worked when I put it up there. I plugged it in a couple of times to make sure it still worked.
>
> Q    Was it hard wired?
>
> A    No, ma'am.
>
>                              * * *
>
> Q    And you say you never needed to use it?
>
> A    I have not had . . . an occasion to pump water off of the roof with that pump, no.

Reeve Decl., Ex. 3 at 13-15, 17.  Based on this testimony, the City asserts Plaintiffs have not shown they ever used the sump pump to pump excess water off of the roof.  Even though the power to the West Burnside building was turned off, the City maintains Plaintiffs have not established the pump would otherwise have been on and working to keep the roof dry.  Thus, according to the City, Plaintiffs also have not established the water accumulation and collapse of the roof was caused by the failure of the sump pump or, in turn, that the collapse was caused by the shut off of electrical power to the West Burnside property.

Plaintiffs, however, point to Michael Wright's Declaration filed in support of Plaintiffs' Response in which Wright testifies although he never "manually activated the pump to pump water during the 10-12 year period that it was in place . . ., the pump was continually plugged in and had an automatic internal switch that was triggered by accumulating water.  I never needed to manually activate the pump because it

42 - OPINION AND ORDER

automatically pumped water from the roof when water began

accumulating."  Wright Decl. ¶ 15.  As the City notes, however,

Wright's testimony in his Declaration is contradicted by his

deposition testimony in which he makes clear that he never needed

to pump water off of the roof and would have had to turn the pump

on manually because the it was not hard-wired.

The Ninth Circuit has held "'a party cannot create an

issue of fact by an affidavit contradicting his prior deposition

testimony.'"  *Nelson v. City of Davis*, 571 F.3d 924, 927 (2009)

(quoting *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th

Cir. 1991)).  Accordingly, Plaintiffs cannot establish a material

dispute of fact exists arising from Wright's Declaration because

it is contradicted by his earlier deposition testimony that the

pump was never needed or used to pump water off of the roof.

Thus, Plaintiffs have not established the City caused the roof to

collapse by shutting off the power to the West Burnside property.

On this record, therefore, the Court concludes

Plaintiffs have not established a reasonable juror could conclude

the City was negligent when it asked PGE to turn off the power to

both properties rather than just to the Fourth Avenue property or

that the lack of power to the sump pump caused the roof to

collapse.  Accordingly, the Court grants City Defendants' Motion

for Summary Judgment as to Plaintiffs' negligence claim.[3]

**CONCLUSION**

For these reasons, the Court **GRANTS** City Defendants' Motion (#43) for Summary Judgment and **DISMISSES** this matter **with prejudice**.

The Court **DIRECTS** counsel for City Defendants to confer with all counsel (including counsel for Defendant PGE) to submit no later than **April 15, 2011**, an appropriate form of judgment.

IT IS SO ORDERED.

DATED this 7th day of April, 2011.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

_____

[3] Although the Court does not need to resolve formally the City Defendants' discretionary immunity defense under state law, the Court noted at oral argument that this defense ordinarily does not apply to common acts of negligence by city employees. *See Timberlake ex rel Estate of Lyon v. Washington Cnty.,* 228 Or. App. 607, 613 (2009)

44 - OPINION AND ORDER